**Michael Sheridan McKINNEY, Petitioner–Appellee,**

v.

**Robert M. REES, Superintendent of Deuel Vocation Institution, and Attorney General of the State of California, John K. Van De Kamp, Respondents–Appellants.**

**No. 89–55869.**

United States Court of Appeals, Ninth Circuit.

April 28, 1993.

As Amended June 10, 1993.

Robert S. Henry, Deputy Atty. Gen., Los Angeles, CA, for respondents-appellants.

Charles D. Weisselberg, Dennis E. Curtis, Michael Brennan, Mary Ann Soden (Law Student) and Robert Odson (Law Student), Post–Conviction Justice Project, University of Southern California Law Center, Los Angeles, CA, for petitioner-appellee.

Joseph A. Burns, Dist. Attys Office, San Bernardino, CA, for amicus.

Before: BROWNING and PREGERSON, Circuit Judges, and ORRICK,* Senior District Judge.

ORRICK, Senior District Judge:

Respondents–Appellants, Robert M. Rees, Superintendent of Deuel Vocational Institution, and John K. Van de Kamp, then Attorney General of the State of California ("State"), appealed the conditional grant of a writ of *habeas corpus* to Michael Sheridan McKinney entered by the United States District Court for the Central District of California. We affirmed in our Memorandum filed September 5, 1990. The Supreme Court of the United States granted *certiorari,* —— U.S. ——, 112 S.Ct. 859, 116 L.Ed.2d 767, vacated our opinion, and remanded the case for further consideration in light of *Estelle v. McGuire,* —— U.S. ——, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), which reversed the decision of this court. *McGuire v. Estelle,* 902 F.2d 749 (9th Cir.1990). After considering supplemental briefing and the *Estelle* opinion, we again affirm, finding *Estelle* inapposite to the case at bench.

## I.

In *Estelle,* the Supreme Court overturned our holding that the erroneous admission of evidence, coupled with a prejudicial instruction, rendered McGuire's trial fundamentally unfair. McGuire was prosecuted for the murder of his infant daughter. The disputed evidence was evidence that the child suffered prior serious injuries, characteristic of the "battered child syndrome." The trial court admitted the evidence as proof that the injuries from which she died were inflicted intentionally, rather than accidentally. We found that the lack of connection between the prior injuries and the defendant rendered the evidence irrelevant, but the Supreme Court reversed, finding that the "battered child syndrome" evidence was relevant and probative of the essential element of intent. *Estelle,* —— U.S. at ——, 112 S.Ct. at 480. The defendant's decision not to contest that element did not lift the burden from the prose-

---

\* Honorable William H. Orrick, Senior United States District Judge for the Northern District of California, sitting by designation.

cution to prove it. *Id.* at ——–——, 112 S.Ct. at 480–81. The Supreme Court found that even if the jury instructions were somewhat ambiguous, there was not a reasonable likelihood that the jury would have used the prior injury evidence impermissibly as propensity evidence. Therefore, it concluded, there was no violation of McGuire's due process rights. *Id.* at ——–——, 112 S.Ct. at 483–84. The Court did not address the questions of whether the admission of irrelevant evidence could violate the due process guaranteed by the Fourteenth Amendment (*id.*), or whether the use of character evidence to show propensity would violate the Due Process Clause. *Id.* at —— n. 5, 112 S.Ct. at 484 n. 5.

## II.

As we now reconsider this case in light of *Estelle,* we are mindful that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at ——, 112 S.Ct. at 480. McKinney claims, as he did in the Court of Appeal of the State of California, that his constitutional right to a fundamentally fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment was violated. *See Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963). It is this claim that this court must evaluate. This court also is mindful of the reiteration by the *Estelle* Court that "'the category of infractions that violate "fundamental fairness"'" is a very narrow one. —— U.S. at ——, 112 S.Ct. at 482 (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990)).

■ We now examine the contested evidence to determine, first, whether like the contested evidence in *Estelle,* it was relevant to an essential element in the prosecution's case, and second, if not, whether its admission rendered McKinney's trial fundamentally unfair.[1]

### A.

■ Evidence is considered irrelevant if it fails to make any fact of consequence more or less probable. *See* Fed.R.Evid. 401. Irrelevant evidence may merely be a waste of time, may confuse the jury, or may cause serious prejudice to the defense. The argument regarding relevance in this case is different from that in *Estelle.* In *Estelle,* the Supreme Court found that the "battered child syndrome" evidence was relevant to the intentional nature of the injuries that killed the child, a fact of consequence. —— U.S. at ——, 112 S.Ct. at 480. The contested evidence in this case can loosely be termed "other acts" evidence. "Other acts" evidence may be relevant to a fact of consequence, or it may be relevant only insofar as it proves the character of the defendant in order to show action in conformity therewith, in which case it is a form of character evidence.

Preliminarily, it is helpful to discuss the use of character evidence. The use of "other acts" evidence as character evidence is not only impermissible under the theory of evidence codified in the California rules of evidence (Cal.Evid.Code § 1101 (West Supp. 1993) and the Federal Rules of Evidence (Fed.R.Evid. 404(b)), but is contrary to firmly established principles of Anglo–American jurisprudence. In 1684, Justice Withins recalled a prior case in which the court excluded evidence of any forgeries, except the one for which the defendant was standing trial. *Hampden's Trial,* 9 How.St.Tr. 1053, 1103 (K.B. 1684). Similarly, in *Harrison's Trial,* the Lord Chief Justice excluded evidence of a prior wrongful act of a defendant who was on trial for murder, saying to the prosecution: "Hold, what are you doing now? Are you going to arraign his whole life? Away, away, that ought not to be; that is nothing to the matter." 12 How.St.Tr. 834 (Old Bailey 1692). Early American courts retained the rule against using "other acts" evidence as character evidence to show action in conformity therewith. *See, e.g., Rex v. Doaks,* Quincy's Mass.Reports 90 (Mass.Su-

---

1. Although a federal court is bound to give deference to factual determinations of all state courts (*Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981) (interpreting 28 U.S.C. § 2254(d))), we review the decision of the district court to grant a conditional writ *de novo. Weygandt v. Ducharme,* 774 F.2d 1491, 1492 (9th Cir.1985).

per.Ct.1763) (excluding evidence of former acts of lasciviousness from the trial of a defendant accused of keeping a bawdy house); *Boyd v. United States*, 142 U.S. 450, 458, 12 S.Ct. 292, 295, 35 L.Ed. 1077 (1892) (finding that admission of prior crimes committed by defendants so prejudiced their trial as to require reversal). As acknowledged by the Supreme Court in *Brinegar v. United States*, 338 U.S. 160, 174, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949):

> Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property.

The rule against using character evidence to show behavior in conformance therewith, or propensity, is one such historically grounded rule of evidence. It has persisted since at least 1684 to the present, and is now established not only in the California and federal evidence rules, but in the evidence rules of thirty-seven other states and in the common-law precedents of the remaining twelve states and the District of Columbia.[2]

The question brought to us by McKinney and returned to us by the Supreme Court is whether the admitted evidence of "other acts" of the defendant was relevant to a fact of consequence, or was only evidence of character offered to show propensity. Under the historic rule against character evidence, such evidence is not relevant to any fact of consequence. We summarize the contested evidence and then subject it to close scrutiny to determine whether any inferences relevant to a fact of consequence may be drawn from each piece of the evidence, or whether they lead only to impermissible inferences about the defendant's character.[3]

### 1.

The "other acts" evidence in this case centers around knives. The victim, McKinney's mother Betty McKinney, died on January 28, 1984, after her throat was slit. The medical examiner testified that the cuts could have been made by almost any kind of knife, including ordinary kitchen knives found in the house, and a Buck knife, that McKinney's father, Quentin McKinney, was wearing on his belt when the police arrived at the scene. None of the knives at the scene bore any sign of blood, and the murder weapon was never identified.

---

**2.** The rule forbidding the admission of evidence of character to show propensity has been codified in thirty-seven states other than California. *See* Alaska Evid.Code § 404; Ariz.R.Evid. 404; Ark.R.Evid. 404; Colo.R.Evid. 404; Del.R.Evid. 404; Fla.Stat. § 90.404; Haw.R.Evid. 404; Idaho R.Evid. 404; Iowa R.Evid. 404; Kan.Stat. Ann. § 60–447; Ky.R.Evid. 404; La.Code Evid. Ann. art. 404; Me.R.Evid. 404; Mich.R.Evid. 404; Minn.R.Evid. 404; Miss.R.Evid. 404; Mont. R.Evid. 404; Neb.Rev.Stat. § 27–404 (Reissue 1989); Nev.Rev.Stat. § 48.045 (1986); N.H.R.Evid. 404; N.J.R.Evid. 47; N.M.Stat.Ann. § 11–404 (Michie 1986); N.C.Gen.Stat. § 8c–1, Rule 404 (1988 & Cumm.Supp.1990); N.D.R.Evid. 404; Ohio R.Evid. 404; Okla.Stat. tit. 12, § 2404 (1991); Or.R.Evid. 404; R.I.R.Evid. 404; S.D.Codified Laws Ann. § 19–12–5 (1992); Tenn.R.Evid. 404; Tex.R.Crim. Evid. 404; Utah R.Evid. 404; Vt.R.Evid. 404; Wash.R.Evid. 404; W.Va.R.Evid. 404; Wis. R.Evid. 904.03; Wyo.R.Evid. 404.

Twelve other states and the District of Columbia have adopted the rule against the admission of character evidence to show propensity

through case law. *See Artis v. United States*, 505 A.2d 52, 56 (D.C.App.1986), *cert. denied*, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986); *Anonymous v. State*, 507 So.2d 972, 973–74 (Ala. 1987); *State v. Holliday*, 159 Conn. 169, 268 A.2d 368, 369 (1970); *Brown v. State*, 197 Ga. App. 155, 398 S.E.2d 34, 34 (1990); *People v. Kannapes*, 208 Ill.App.3d 400, 153 Ill.Dec. 419, 421–22, 567 N.E.2d 377, 379–80 (1990); *Penley v. State*, 506 N.E.2d 806, 808 (Ind.1987); *Ross v. State*, 276 Md. 664, 350 A.2d 680, 684 (1976); *Commonwealth v. Chalifoux*, 362 Mass. 811, 291 N.E.2d 635, 638 (1973); *State v. Clark*, 801 S.W.2d 701, 703 (Mo.App.1990); *People v. Powell*, 152 A.D.2d 918, 543 N.Y.S.2d 818, 819 (1989); *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491, 497 (1988); *State v. Griffin*, 277 S.C. 193, 285 S.E.2d 631, 633–34 (1981); *Brooks v. Commonwealth*, 220 Va. 405, 258 S.E.2d 504, 506 (1979).

**3.** We note, of course, that there are exceptions to the rule against character evidence. For example, Rule 404(a) of the Federal Rules of Evidence permits the use of character evidence by an accused.

The court admitted evidence that Michael McKinney had possessed a "Gerber" knife that was confiscated by a police officer in September 1983 and never returned, and that he had also owned a "Tekna" knife in the fall of 1983. Both knives were double-edge, dagger-type knives. Like the knives found at the scene, these knives could have inflicted the type of wounds suffered by Mrs. McKinney. There was conflicting evidence regarding when the Tekna knife was in McKinney's possession. McKinney and a friend of his, Constantine Potamianos, testified at trial that McKinney gave Potamianos the Tekna knife before Thanksgiving. Several months after the murder, Potamianos gave the police a Tekna knife he claimed was the one McKinney had given him. McKinney's college roommate, Christopher Roderick, testified that he saw McKinney with a Tekna-type knife sometime between Thanksgiving and December 9, 1983, contradicting his earlier statement to police that it was late October when he saw McKinney with the knife.

There was also testimony that McKinney was proud of his "knife collection," that on occasion he strapped a knife to his body while wearing camouflage pants, and that he used a knife to scratch the words "Death is His" on the door to his closet in his dormitory room. The prosecutor questioned McKinney about his "fascination" with knives, and about whether he enjoyed looking at, talking about, and possessing knives. In his closing argument, the prosecutor described his case as concentrating on three things, one of which was "any knives the defendant may have owned." He reiterated that the connection McKinney had to any knives that could have been used in this crime was important.

2.

We now consider whether any pieces of the contested knife evidence were evidence from which inferences relevant to any fact of consequence may have been drawn.

To prove that McKinney was guilty of murder, the prosecution had to prove the following elements: (1) that McKinney killed a human being; (2) that the killing was unlawful; and (3) that the killing was done with malice aforethought. Cal.Penal Code § 187; CALJIC 8.10. In addition, to prove McKinney was guilty of first-degree murder, the prosecution had to prove that the killing was "willful, deliberate and premeditated," "with express malice aforethought." CALJIC 8.20. If the knife evidence tended to make any fact relevant to these elements more or less probable, it was relevant and admissible, just as the "battered child syndrome" evidence in *Estelle* was admissible to prove intent.

The State argues that the knife evidence described above was admissible to dispute McKinney's claim that he was "knife-free" at the time of the murder. It argues that this evidence tends to show that he was lying and that he actually owned a Tekna knife on January 28, 1984, but lied about it out of guilt to cover up the fact that he had hidden his knife after using it to kill his mother. The State concludes that, therefore, the evidence was probative of opportunity, making it more likely that McKinney did the killing, a conclusion the state appellate court also reached.[4]

We analyze this argument in support of the admission of the evidence of the Gerber knife, the wearing of camouflage and a knife, the "Death is His" carving, and the Tekna knife *seriatim*.

The evidence regarding the Gerber knife that was indisputably no longer in McKinney's possession on January 28, 1984, is irrelevant to any element of the prosecution's case, including opportunity, and is irrelevant to any argument that he was "knife-free." The only inference the jury could have drawn from such evidence is that because McKinney had owned a knife in September 1983, he owned a knife in January 1984, *i.e.*, that he was the type of person who would own a knife. The evidence thus was evidence of another act offered to prove character and

4. The State attempts to bind this court to the findings of the state appellate court by characterizing as much of the state court's opinion as findings of fact as possible. As discussed above, this court recognizes that under *Sumner*, and principles of comity, it is bound by *factual* findings of the state courts. The legal conclusions regarding the admissibility of evidence, however, are not findings of fact, and are not binding on this court.

giving rise to a propensity inference, and did not tend to prove a fact of consequence.

Similarly, evidence that McKinney at times in the past wore a knife when wearing camouflage and that he scratched the words "Death is His" on the door to his dormitory room closet is also irrelevant to his opportunity to kill his mother, *i.e.*, to whether he had a Tekna-type knife in his possession at the time of the murder. The only inference to be drawn from the fact that McKinney twice in the past was seen wearing a knife with his camouflage pants was that because his camouflage pants were apparently worn by the murderer,[5] he was wearing them with a knife the night of the murder. That inference, like the inference that because McKinney owned a knife in September, he owned one in January, is an impermissible propensity inference based on other acts offered to prove character, *not* evidence of opportunity. Like the evidence of the confiscated knife, that evidence gave rise to no permissible inferences making a fact of consequence more or less probable.[6]

It is hard to imagine any inference at all to be drawn from the fact that McKinney scratched "Death is His" on his closet door, words that were not explained at trial, except that perhaps he had a fascination with death and knives and, therefore, was more likely to have committed a murder with a knife. The trial court not only permitted testimony about this other act, but admitted color photographs of the scratches in the door.

The State argues that the peculiar nature of what McKinney carved was admissible to lend credence to Roderick's testimony of when he saw McKinney with a knife. It argues that the evidence permitted the jury to make the inference that because McKinney wrote such a peculiar and disturbing thing on the wall of their shared dormitory room, Roderick was more likely to remember accurately the date on which he saw McKinney using the knife. This inference, while unrelated to McKinney's character, is not logical. The nature of McKinney's activity may have made the incident stand out sharply in his roommate's mind, but does not go to Roderick's remembrance of the *date*. In contrast, testimony that Roderick had just returned from a Thanksgiving vacation trip, a detail related to the temporal element of the incident, would logically give rise to an inference that Roderick was able to place the scratching incident accurately in time. The evidence of the carving is, again, "other acts" evidence offered as character evidence, not probative of any element of the offense with which McKinney was charged, or even of the State's definition of "opportunity." There are no rational inferences, permissible under the historical rule against character evidence, raised by the evidence.

The evidence regarding McKinney's possession of the Tekna knife is slightly different, because there was conflicting evidence regarding the dates of his possession, as discussed above. It is not evidence of another act, but of a simple fact: whether McKinney was the owner of a knife on the date of the murder. The State argued at trial that either McKinney and Potamianos lied when they testified that McKinney gave Potamianos the knife before Thanksgiving, or that McKinney bought another knife that Roderick saw after Thanksgiving. It argues that if the jury believed Roderick's testimony that McKinney had a Tekna knife some seven weeks before the murder, it could, therefore, infer that McKinney had a Tekna knife in his possession at the time of the murder, and that if McKinney had the knife in his possession, he rather than his father, was more likely to use it to commit the crime. Further, the State argues that the jury could infer that the failure to find the knife at the scene or in McKinney's possession indicates that it was hidden, that it was hidden because it was bloody, that it was bloody because it was the murder weapon and, therefore, because McKinney was more likely to

---

**5.** A pair of McKinney's camouflage pants, soaked with blood of his mother's type on the right leg, was found in the room in which he had been sleeping while staying at his parents' house that January.

**6.** This analysis also applies to the miscellaneous evidence of McKinney's fascination with knives, including discussion of his collection, sharpening activities, and window shopping for knives. All the evidence was evidence of other acts offered as character evidence to show McKinney's propensity to own knives.

have used the knife to commit the murder, that McKinney did commit the murder.

Although this evidence may have been more prejudicial than probative and, thus, inadmissible under California evidence law, this court is only concerned with its relevance. Because the evidence that McKinney had a Tekna-like knife in his possession soon after Thanksgiving makes a fact of consequence, his identity as the murderer, more probable, its admission was not in violation of the historically grounded rule against the use of "other acts" evidence to prove character.[7]

## B.

Having concluded that much of the disputed evidence was "other acts" evidence probative only of character and, thus, irrelevant, this court must decide whether the erroneously admitted evidence was " 'of such quality as necessarily prevents a fair trial.' " *Kealohapauole v. Shimoda,* 800 F.2d 1463, 1465 (9th Cir.1986) (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1991)), *cert. denied,* 479 U.S. 1068, 107 S.Ct. 958, 93 L.Ed.2d 1006 (1987). As the Supreme Court recently reiterated in *Dowling,* when determining whether a due process violation has occurred, courts "are to determine only whether the action complained of ... violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." 493 U.S. at 353, 110 S.Ct. at 674 (internal quotation marks and citations omitted).

Previously we have held that "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." *Jammal v. Van de Kamp,* 926 F.2d 918, 920 (9th Cir.1991). Because drawing propensity inferences from "other acts" evidence of character is impermissible under an historically grounded rule of Anglo–American jurisprudence, the knife evidence meets the strict test we established in *Jammal.* There are *no* permissible infer-

ences the jury could have drawn from the character evidence discussed above. The admission of this evidence, therefore, could have violated due process. We must now consider whether, under the facts of this case considered as a whole, the admission of irrelevant character evidence did violate due process. Thus, we address the question left unanswered in *Estelle:* When does the use of character evidence to show propensity constitute a violation of the Due Process Clause?

The gravamen of the historic attempt to exclude such character evidence is to force the jury, as much as humanly possible, to put aside emotions and prejudices raised by phrases such as "fascination with knives" and "Death is His," and consider the body of evidence, both testimonial and physical, before them, in order to decide if the prosecution has convinced them, beyond a reasonable doubt, that the defendant is guilty of the crime charged. The character rule is based on such a "fundamental conception of justice" and the "community's sense of fair play and decency" as concerned the Supreme Court in *Dowling.* After all, as shown above,

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish the probability of his guilt.... The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948) (footnotes omitted).

---

7. It is also faintly relevant to the issue of opportunity. It is undisputed that McKinney was in the house at the time of the murder, and that he had access to numerous knives that could have been the murder weapon. If he also had a knife in his personal possession, his opportunity to

commit a murder with a knife is slightly enhanced. Because we find that the evidence was relevant to the issue of identity, which is an essential element, we do not analyze further the question of opportunity.

Unlike the disputed evidence in *Jammal,* 926 F.2d at 920, which we described as "relatively sterile," [8] the evidence in this case is emotionally charged. The prosecution used evidence of the Gerber knife, which could not possibly have been used to commit the murder, to help paint a picture of a young man with a fascination with knives and with a commando lifestyle. The prosecutor raised the issue on cross-examination of why McKinney had purchased a knife with a black blade, asking him whether it was because such knives are favored by commandos because they do not reflect light. The jury was offered the image of a man with a knife collection, who sat in his dormitory room sharpening knives, scratching morbid inscriptions on the wall, and occasionally venturing forth in camouflage with a knife strapped to his body. This evidence, as discussed above, was not relevant to the questions before the jury. It served only to prey on the emotions of the jury, to lead them to mistrust McKinney, and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive.

Further, the case against McKinney based on relevant evidence was solely circumstantial. Two men, the defendant and his father, were found at the scene of the murder. Neither man confessed to the crime, and neither man testified that he saw the other commit the crime. The father's bloody T-shirt was in the bathtub. McKinney's bloody pants were in the den. Neither man had a clear motive.[9] While there was an abundance of knives in the house, no bloody knife was found. Aside from the clothing and knives, and testimony of the police officers and neighbors who came to the scene, the chief evidence to be weighed by the jury was the testimony of McKinney and his father, giving differing accounts of the evening.

In this situation, McKinney's trial was impermissibly tainted by irrelevant evidence such that it is more than reasonably likely that the jury did not follow its instructions to weigh all the evidence carefully, but instead skipped careful analysis of the logical inferences raised by the circumstantial evidence and convicted McKinney on the basis of his suspicious character and previous acts, in violation of our community's standards of fair play.

The analysis that leads us to conclude that the erroneous admission of propensity evidence rendered McKinney's trial fundamentally unfair in violation of the Due Process Clause is similar to the analysis we must undertake to determine whether his conviction must be set aside on collateral review. The Supreme Court recently held that a federal court, reviewing whether the state prosecution's use of the defendant's post-*Miranda* silence necessitates *habeas corpus* relief, must determine whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1713, 123 L.Ed.2d 353 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Like the rule against the use of character evidence, the rule against the use of post-*Miranda* silence for impeachment purposes, articulated in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), is "rooted in fundamental fairness and due process concerns." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717. And like *Doyle* error, the kind of error that occurred in this case is "trial error" that necessitates *habeas* relief when it results in grievous wrong to a defendant at the hands of the state. *Id.* —— U.S. at —— – ——, 113 S.Ct. at 1717–18.

This case, however, does not present the same factual situation as *Brecht,* in which erroneous references to post-*Miranda* silence were "in effect, cumulative" of admissible evidence of pre-*Miranda* silence and there was "weighty" evidence of defendant's guilt. *Id.* —— U.S. at ——, 113 S.Ct. at 1722. Like Justice Stevens, we review the trial transcript to determine *not* whether the jurors were

---

**8.** The disputed evidence in *Jammal* was evidence that, when arrested, the defendant was driving a car with $135,000 in the trunk. 926 F.2d at 920.

**9.** Quentin testified that there had been an earlier discussion about McKinney's financial aid for the semester, and that he and his wife had privately decided to refuse him a further loan. While the prosecution argued that McKinney may have argued with his mother about the money, McKinney testified that when he went out that night, he understood that he would get the loan.

right in their judgment, regardless of the error or its effect upon the verdict. [But] rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.

This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.

*Kotteakos*, 328 U.S. at 764, 66 S.Ct. at 1247–48 (citations omitted) (quoted in *Brecht*, ─── U.S. at ────, 113 S.Ct. at 1724 (Stevens, J., concurring). As discussed above, a review of the record leads us inexorably to the conclusion that the erroneously admitted character evidence was not only irrelevant, but just the sort of evidence likely to have a strong impact on the minds of the jurors. The knife evidence was not cumulative or insignificant. We count over sixty pages of testimony in the record regarding McKinney's knife ownership, and camouflage pants.[10] Nor was the evidence against McKinney "weighty," as discussed above. This is not a case, like *Brecht*, in which the defendant confessed to the killing. The jury was faced with the choice

between Michael McKinney and Quentin McKinney, two men who were present on the scene and two men who each had owned knives that could have been used to commit the murder. Circumstantial evidence implicated each of them.

Because of the lack of a "weighty" case against McKinney, and pervasiveness of the erroneously admitted evidence throughout the trial, we think it "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253. His was not the trial by peers promised by the Constitution of the United States, conducted in accordance with centuries-old fundamental conceptions of justice. It is part of our community's sense of fair play that people are convicted because of what they have done, not who they are. Because his trial was so infused with irrelevant prejudicial evidence as to be fundamentally unfair, McKinney is entitled to the conditional writ of *habeas corpus* that the district court awarded him.[11]

Affirmed.

---

**10.** One witness, Officer Brent Smith, was called solely to testify about the confiscation of McKinney's knife in September. Prosecution witnesses Potamianos, Roderick, Pamela Kouba, Jane Kelsey, and Detective Freeze were asked about knives and camouflage clothing, and Michael McKinney testified both on direct, and more extensively, on cross-examination about the knives. One exchange with the prosecutor was as follows:

Q: Well, you have a certain fascination with knives, don't you, Michael?
A: What do you mean by fascination?
Q: Don't you like knives? Don't you like owning knives?
A: Yes.
Q: If you are walking by a store, for example, that had a collection of various daggers and knives, don't you like stopping and looking at them and examining them?
A: Yes.
....

Q: And in fact, knives were your hobby, weren't they? One of your hobbies?
A: No.
Q: You enjoyed collecting them. You enjoyed talking about them, talking about the different type of knives that you had, didn't you?
A: Yes, I talked about the different type of knives I had.

The prosecution summarized all this testimony in its closing argument, and twice reiterated that McKinney's knife ownership was one of two or three crucial issues in the case.

**11.** The court notes that its analysis is consistent with its reasoning in *Henry v. Estelle*, 993 F.2d 1423 (9th Cir.1993), in which it also found that the erroneous admission of irrelevant prior acts evidence was distinct from the situation in *Estelle*, ─── U.S. ────, 112 S.Ct. 475, 116 L.Ed.2d 385 and a violation of due process that necessitated the grant of *habeas* under *Brecht*.