Filed 9/20/13  P. v. Anselmi CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C068302 |
| v. | (Super. Ct. No. SF111054A) |
| WILLILAM HENRY ANSELMI, | |
| Defendant and Appellant. | |

Defendant William Henry Anselmi, leader of the Stockton chapter of the Misfits Motorcycle Club (Misfits), fired an M-16 assault rifle from a motor vehicle at the home of Bobby Riley, leader of the Stockton chapter of the Jus Brothers Motorcycle Club (Jus Brothers).  Debris created by the barrage of bullets struck Riley in the face and head. One of the bullets lodged in Riley's forearm.  Based on this incident, a jury convicted defendant of attempted premeditated murder (Count 1), conspiracy to commit murder (Count 5), discharge of a firearm from a motor vehicle (Count 6), discharge of a firearm at an inhabited dwelling (Count 7), criminal street gang activity (Count 8), assault with a

semi-automatic firearm (Count 9), and infliction of injury on an elder adult (Count 14).[1] Criminal street gang enhancement allegations attached to Counts 1, 5 through 7, 9, and 14 were also found to be true. With respect to Counts 1 and 7, the jury found defendant personally and intentionally discharged a firearm causing great bodily injury. With respect to Counts 1 and 9, the jury found defendant personally inflicted great bodily injury on a person 70 years of age or older. With respect to Counts 6 and 9, the jury found defendant inflicted great bodily injury by discharging a firearm from a motor vehicle.

Defendant was also charged with assault with a deadly weapon based on a separate incident involving a bar fight with Byron O'Neill, another member of the Jus Brothers (Count 13). He was found not guilty of this crime and found guilty of the lesser-included offense of simple assault.

Following a bifurcated hearing, the trial court found defendant had previously been convicted of two strike offenses within the meaning of the three strikes law. (Pen. Code, §§ 667, subds. (b)-(i), 1170.12.)[2] He was sentenced to state prison for an indeterminate term of 75 years to life plus a consecutive determinate term of 10 years.

On appeal, defendant contends: (1) there is insufficient evidence to support the jury's implied finding that the Misfits qualified as a criminal street gang within the meaning of section 186.22, subdivision (f); (2) defendant was deprived of his constitutional right to due process and a fair trial by (a) the jury's exposure to photographs showing defendant wearing a hat that had "White Power" printed on it

---

[1] Because defendant fired at Riley's house during two separate passes, and because sheriff's deputies arrived near the scene of the shooting immediately before the second pass and believed defendant was firing at them, defendant was also charged with the attempted murder of three deputies (Counts 2-4) and assault with a semi-automatic firearm on these deputies (Counts 10-12). He was acquitted of these counts.

[2] Undesignated statutory references are to the Penal Code.

despite the trial court's ruling that no evidence would be admitted regarding the racial views of either defendant or the Misfits and (b) the admission of certain portions of defendant's statement to police, which the trial court also ruled were inadmissible, in which defendant stated he was on parole following serving a term in federal prison for being a felon in possession of a firearm, the Misfits were not like 99 percent of motorcycle clubs (i.e., not a "[f]amily club"), he earned his Misfits vest by "[b]eating people up," he assaulted a young man in a bar with a taser, he shot a man in the buttocks while the man was in a truck with his children, and he and other Misfits had manufactured methamphetamine in the past; and (3) defendant's trial counsel rendered constitutionally deficient assistance by failing to prevent the jury from receiving the foregoing evidence.

As we explain, substantial evidence supports the jury's finding that the Misfits qualified as a criminal street gang within the meaning of section 186.22, subdivision (f). Nor was defendant deprived of his constitutional right to due process and a fair trial by the jury's exposure to evidence the trial court ruled to be inadmissible. And assuming defendant's trial counsel acted unreasonably in failing to object to this evidence as it was being admitted, we find no reasonable probability of a more favorable result had the jury not been exposed to this evidence. Accordingly, on the facts of this case, we cannot reverse defendant's convictions on the basis of ineffective assistance of counsel. We affirm the judgment.

FACTS

The conflict between defendant and Riley arose out of two breaches of motorcycle club etiquette. The first breach was Randy Coleman's decision to leave the Jus Brothers and join the Misfits without the permission of Riley and the rest of the club's executive board. The second breach occurred after defendant set up a meeting with Riley to try to smooth over Coleman's transgression. According to defendant, the meeting was supposed to be between the two leaders and their respective sergeants-at-arms, but Riley

3

"show[ed] up sixty strong and started talking shit." Defendant felt "disrespected," left the meeting, and retaliated about a month later by firing an M-16 assault rifle at Riley's house and the adjacent Jus Brothers clubhouse. We provide a more detailed account of events immediately below.

### Incident at the Haven Acres Bar

As mentioned, the events leading to the drive-by shooting in this case begin with Coleman's decision to leave the Jus Brothers on bad terms. Coleman was a member of the Jus Brothers for about 10 years. In 2007, Coleman met defendant through defendant's girlfriend, Christy Huston. Defendant was a member of the Misfits. At that time, the Misfits did not have a Stockton chapter. Nor was there any rivalry between the Misfits and the Jus Brothers. The two became friends.

In November 2008, Coleman spent about two weeks in the hospital due to pneumonia. Coleman's girlfriend, Debra Fowler, informed the Jus Brothers of his condition, but no one from the club came to visit him in the hospital. Coleman was "offended" because, as he explained, the Jus Brothers was supposed to be a brotherhood: "[T]hey expect you to be there for them, and you expect them to be there for you." While the Jus Brothers did not visit Coleman in the hospital, defendant did. After his release from the hospital, Coleman approached Riley and the rest of the Jus Brothers executive board and asked for their permission to retire from the club. The request was denied. Riley was the most vocal about Coleman not being allowed to leave the club.

Around the same time, Coleman told defendant he was considering leaving the Jus Brothers and joining the Misfits. Defendant explained that he was in the process of starting a Stockton chapter. Defendant would be the president of the new chapter and another Misfit, Bobby Love, would be the vice president. Defendant offered to sponsor Coleman's membership in the Misfits if he "drop[ped] the Jus Brothers patch."

One night, Coleman, Fowler, and Love were drinking at the Haven Acres Marina Bar & Grill in Lathrop. Coleman was wearing his Jus Brothers vest. A group of four or

4

five Jus Brothers came into the bar and greeted Coleman. Coleman responded by removing his Jus Brothers vest, handing it to one of the men, and putting on a Misfits vest. This "was meant to be an insult." The Jus Brothers left the bar and returned about an hour later with 10 or 12 members, who started "running their mouths" and "shooting insults" at Coleman. One of the members was "Little Fred," the sergeant-at-arms. He challenged Coleman to come outside. Coleman declined. Eventually, the Jus Brothers left the bar, kicked over Coleman's motorcycle, and slashed the tires on Fowler's car. From that point forward, Coleman no longer considered himself a member of the Jus Brothers. However, he still owed the Jus Brothers certain items that were considered club property.

### *Meeting Between Defendant and Riley at the Heinbockel Bar*

When Riley learned Coleman had left the Jus Brothers to join the Misfits without permission and without returning club property, he was upset and offended. Defendant offered to "try to talk some sense with [Riley]" and to return the Jus Brothers's property in Coleman's possession. Coleman agreed. Defendant then called Jus Brothers member Byron O'Neill and asked him to set up a meeting with Riley. The meeting occurred in December 2008 at the Heinbockel Bar in Tracy. As mentioned, the meeting was supposed to be between the two leaders and their respective sergeants-at-arms. Defendant brought Love. According to defendant, Riley brought "[h]is whole fucking club," around 60 members. Riley claimed the number was closer to 20, but acknowledged this was "many more people than [he] should have" brought to the meeting. Defendant "felt like he was set up."

According to Riley's account of the meeting, after introductions were made, Riley "asked [defendant] if [Coleman] was wearing his colors." Defendant confirmed that he was. Riley then asked defendant "if he knew that [Coleman] was a Jus Brother." Defendant answered that Coleman "told him that he had quit the club." Riley responded that Coleman "was a liar" and that "he was still a member of the [Jus Brothers]."

5

Defendant handed Riley a box containing Jus Brothers patches that previously belonged to Coleman. Riley told defendant he would "slap the hell out of [Coleman]" if he saw him again. Defendant responded: "Enough said." He and Love then left the meeting. Defendant's version of events was similar, but he claimed Riley threatened to "beat [Coleman's] ass and any Misfits that are with him."

After the meeting, defendant went to Coleman's house. He was "pissed off about the situation." Defendant told Coleman that "he was surprised they walked out of [the meeting] alive," that he felt "disrespected" by Riley, that "it was personal to him now," and that "he was going to make it right" through "some kind of retaliation." Coleman drew a diagram of Riley's house and the adjacent building used by the Jus Brothers as a clubhouse and gave it to defendant "so he wouldn't be walking into a blind situation." A few days after the meeting with Riley, defendant told Coleman he wanted to "have [Riley] kidnapped" and "have his head cut off and sent back to the club." However, the people he "got in touch with to do it got arrested." Defendant then told Coleman the alternative plan was to burn down the Jus Brothers clubhouse.

### Incident at the Fireside Inn

On January 18, 2009, defendant was at the Fireside Inn in Lathrop with Love's son, Ryan. Ryan was in the process of becoming a member of the Misfits. O'Neill, the Jus Brother who had set up the meeting with Riley, was also at the bar. In the parking lot, defendant approached O'Neill and asked whether he was still a Jus Brother. When O'Neill responded that he was, defendant punched him in the face. Lisa Hann, a friend of O'Neill who was also in the parking lot, stepped between the men and said she was going to call the police. Defendant punched her in the face. O'Neill then rushed defendant and the men exchanged blows on the ground. At some point, Ryan approached the fight. As defendant and O'Neill got to their feet, defendant pushed Ryan into O'Neill and said: "Kill that motherfucker." According to O'Neill, Ryan "really didn't seem like he wanted to be involved in a fight." No punches were thrown between O'Neill and

6

Ryan; they "were wrestling more than anything," but it was "kind of like a slow dance." O'Neill claimed defendant then stabbed him twice in the abdomen while he was being held by Ryan. O'Neill went back into the bar, but did not call for emergency services because "it didn't seem like that big of a deal." He was able to stop the bleeding with a paper towel.

### Drive-by Shooting of Riley's House

On January 28, 2009, defendant and Love went to Coleman's house near Interstate Highway 5 on the west side of Stockton. They arrived at around 10:00 a.m. Coleman was not expecting company, but was "accustomed to [defendant] dropping by" unannounced. The visitors arrived in defendant's red Monte Carlo. Love was driving. Both men were drunk. Defendant told Coleman he wanted to show him something, retrieved an M-16 assault weapon from the car, and "pointed out that it was fully automatic." Two clips were taped together back-to-back for faster reloading. The weapon had a flash suppressor on the barrel. Defendant told Coleman he and Love had taken the weapon "out to the Delta and fired a few rounds off on it." At about 12:30 p.m., Coleman left for band practice. Defendant and Love also left at this time. Love drove. After going to a liquor store, defendant and Love stopped by Coleman's band practice. They stayed for about 30 minutes drinking liquor and again left together in defendant's Monte Carlo. Love again drove.

At about 6:30 p.m., Love drove defendant's Monte Carlo to Riley's house on Waterloo Road on the east side of Stockton. Defendant was in the back of the car. Directly to the east of Riley's house, on the corner of Waterloo Road and North Golden Gate Avenue, there was a vacant lot. Love pulled up next to this vacant lot and cut the headlights. From the back of the car, defendant fired about 20 rounds from the M-16 into the east side of Riley's house. Riley was alone in the house watching television when the bullets came through the wall. As he explained: "[T]here was a loud pop, and it startled me, and there was dust flying through the house. I thought something had exploded in

7

the house. And then there was another pop and another one, and then I knew that bullets were coming through the wall and I hit the floor." Wall fragments freed by the barrage of bullets hit Riley in the head, back, and legs as he lay on the floor.

After defendant fired this first round of bullets at Riley's house, the Monte Carlo sped away, continuing down North Golden Gate Avenue. Inside the house, Riley crawled around turning off lights. A neighbor who lived south of the vacant lot saw the shooting and came outside to investigate. Sheriff's deputies who were a short distance down Waterloo Road heard the gunfire, drove to the scene of the shooting, saw the neighbor and another man standing next to the vacant lot, and pulled up to question them. Another squad car also pulled up. Meanwhile, the Monte Carlo circled around to Waterloo Road to make another pass along the north side of Riley's house. As Love stopped in front of the house, defendant again opened fire with the M-16. This time, one of the bullets that came through the wall hit Riley in the left forearm. Bullet and wood fragments hit Riley in the head and face. The deputies, still on the east side of the vacant lot, took cover behind their squad cars and radioed "shots fired" to dispatch. The Monte Carlo again sped away, this time eastbound on Waterloo Road toward Highway 99. The deputies got into their squad cars and followed in pursuit, but lost sight of the Monte Carlo on Highway 99.

Riley's daughter was driving to her father's house when the shooting occurred. Her two sons, sister-in-law, and niece were also in the car. When they pulled up to the house, the niece received a phone call from Riley and said to her aunt: "[S]omething's wrong, papa's on the ground." Riley's daughter ran into the house and found Riley on the floor. By this point, multiple squad cars were responding to the "shots fired" dispatch. Riley's daughter ran outside and flagged them down. Within minutes, an ambulance arrived and transported Riley to St. Joseph's Medical Center. As stated, Riley suffered a gunshot wound to the left forearm and penetrating metal and wood fragmentation wounds to the head.

Defendant was interviewed by detectives on February 17, 2009. The contents of this interview will be set forth in greater detail in the discussion that follows. For present purposes, we note defendant claimed to have been in San Leandro the night Riley was shot. According to defendant, he borrowed Ryan's truck to move his girlfriend's sewing machine from Vacaville to San Leandro. While he had Ryan's truck, Love borrowed his Monte Carlo. At 10:30 p.m. on the night of the shooting, Love and Coleman told him they "went by and shot [Riley's] house up." Defendant claimed Coleman admitted to doing the shooting from the back seat while Love drove. At trial, Huston partially corroborated defendant's account, testifying that he arrived in a truck with her sewing machine at around 12:00 p.m. and left her house in San Leandro at around 4:00 p.m.

However, this version of events was contradicted by Coleman's testimony. It was also contradicted by testimony from Jim Cook, an expert in analyzing cell phone data, who testified defendant's cell phone was not used in the vicinity of San Leandro on the day of the shooting. Instead, defendant's phone was in the vicinity of Love's residence in Lathrop at around 9:15 a.m., was in the vicinity of Coleman's house at around 12:00 p.m., was in the vicinity of the crime scene at around 5:30 p.m., and was still in the vicinity of the crime scene shortly before 6:30 p.m., i.e., when the shots were fired at Riley's house. Similarly, Love's cell phone usage reveals he was in the vicinity of Coleman's house at around 12:45 p.m., was in the vicinity of the crime scene at around 5:15 p.m., was traveling eastbound on Highway 4 leaving the vicinity of the crime scene at around 6:50 p.m., was in the vicinity of defendant's residence in Manteca at around 7:05 p.m., and was in the vicinity of his residence at around 8:30 p.m. After Cook testified, during a recess in the trial, defendant said: "Cook really knows his shit."

As mentioned, based on the drive-by shooting of Riley's house, defendant was convicted of attempted premeditated murder, conspiracy to commit murder, discharge of a firearm from a motor vehicle, discharge of a firearm at an inhabited dwelling, criminal street gang activity, assault with a semi-automatic firearm, and infliction of injury on an

9

elder adult. Based on the incident at the Fireside Inn, defendant was convicted of simple assault. Various enhancement allegations, including criminal street gang enhancement allegations, were also found to be true. In support of the gang crime and gang enhancements, Lieutenant David Bertocchini testified as an expert in outlaw motorcycle gangs. We discuss this testimony immediately below.

DISCUSSION

I

### Sufficiency of the Evidence

Defendant contends there is insufficient evidence to support the jury's implied finding that the Misfits qualified as a criminal street gang within the meaning of section 186.22, subdivision (f). He is mistaken.

Section 186.22, subdivision (a), provides criminal punishment for "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." In enacting this provision, "the Legislature sought to punish gang members who acted in concert with other gang members in committing a felony regardless of whether such felony was gang-related." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138 (*Rodriguez*), italics omitted; *People v. Albillar* (2010) 51 Cal.4th 47, 55 ["there is nothing absurd in targeting the scourge of gang members committing any crimes together and not merely those that are gang related"].)

Section 186.22, subdivision (b)(1), provides enhanced punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Unlike the substantive gang crime set forth in section 186.22, subdivision (a), "[t]he enhancement under [section 186.22, subdivision (b)(1),] punishes gang-related conduct, i.e., felonies committed with the

10

specific intent to benefit, further, or promote the gang." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1138; *People v. Gardeley* (1996) 14 Cal.4th 605, 622 (*Gardeley*) ["a criminal offense is subject to increased punishment . . . only if the crime is 'gang related,' that is, it must have been committed, in the words of the statute, 'for the benefit of, at the direction of, or in association with' a street gang"].)

Despite their differences, both the gang crime under section 186.22, subdivision (a), and the gang enhancement under section 186.22, subdivision (b)(1), include the phrase "criminal street gang," which is defined to mean: "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [several criminal acts enumerated elsewhere in the section], having a common name or common identifying sign or symbol, and whose members individually or collectively engage or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) This component of both the gang crime and the gang enhancement "requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.' " (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222, quoting *Gardeley*, *supra*, 14 Cal.4th at p. 617.) Defendant challenges the sufficiency of the evidence to support the "primary activities" element.

In *People v. Sengpadychith* (2001) 26 Cal.4th 316 (*Sengpadychith*), our Supreme Court held that " 'either prior conduct or acts committed at the time of the charged offenses can be used to establish the "primary activities" element of the gang enhancement.' " (*Id.* at p. 323, quoting *People v. Galvan* (1998) 68 Cal.App.4th 1135, 1140.) The Supreme Court explained: "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes

11

is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity (see Evid. Code, § 210) and therefore fall within the general rule of admissibility (*id*. at § 351)." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 323.) However, the Supreme Court was also careful to point out that evidence of *either* past or present criminal acts *alone* would "[n]ot necessarily" be sufficient to prove the group's primary activities, explaining: "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . 'Though members of the Los Angeles Police Department may commit an enumerated offense while on duty, the commission of crime is not a *primary activity* of the department. Section 186.22 . . . requires that one of the primary activities of the group or association itself be the commission of [specified] crime[s]. . . .' " (*Id*. at pp. 323-324.)

The Supreme Court then explained: "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [*Gardeley*, *supra*, 14 Cal.4th 605]. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324, quoting *Gardeley*, *supra*, 14 Cal.4th at p. 620.)

12

Similarly, in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*), the Court of Appeal held the following expert testimony was sufficient to support the "primary activities" element of the gang statute: "Schulze, who had spent the majority of his 14 years in law enforcement dealing with gangs, testified that for the past eight years he had worked in East Los Angeles, the King Kobras territory. He was familiar with the gang based on regular investigations of its activity and interaction with its members. He was also familiar with tattoos KK and VKKR, both of which identify the bearer as a member of King Kobras. He testified that at the time the crime was committed, it had documented members numbering 115 to 120. The gang's primary activities include robbery, assault -- including assaults with weapons, theft, and vandalism. He testified about two predicate offenses, both robberies, one in 2002 and one in 2003." (*Id.* at p. 1330.) Distinguishing *In re Alexander L.* (2007) 149 Cal.App.4th 605, a case in which the gang expert "merely stated 'he "kn[e]w" that the gang had been involved in certain crimes [and] did not directly testify that criminal activities constituted [the gang's] primary activities,' " the Court of Appeal stated: "Here, on the other hand, Schulze had both training and experience as a gang expert. He specifically testified as to King Kobras's primary activity. His eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony." (*Martinez*, *supra*, 158 Cal.App.4th at p. 1330, citing *Gardeley*, *supra*, 14 Cal.4th at pp. 619-620.) Finally, the court noted that the defendant's current offense, committed with another gang member, "is also evidence of the gang's primary activity and is consistent with Schulze's testimony." (*Ibid.*, citing *Sengpadychith*, *supra*, 26 Cal.4th at p. 323.)

Here, Lieutenant Bertocchini testified that he was in law enforcement for 30 years, spent the previous 12 or 13 years predominantly investigating outlaw motorcycle gangs, and was president of the Biker Investigators Association of Northern California. He received approximately 300 hours of formal training regarding outlaw motorcycle gangs

13

through his association and through the International Outlaw Motorcycle Gang Investigators Association. He also taught classes on outlaw motorcycle gangs. With respect to staying current on these gangs, Bertocchini testified he regularly talked to other motorcycle gang investigators, officers involved in motorcycle gang investigations, motorcycle gang members, and informants. He also carried out undercover surveillance at motorcycle gang events. Bertocchini spoke with Manuel Charles, the longest tenured member of the Misfits and leader of the Sacramento chapter, on two occasions.

Turning to the definition of "criminal street gang" found in section 186.22, subdivision (f), Lieutenant Bertocchini testified that the Misfits qualified. With respect to whether the Misfits was an ongoing association involving three or more participants, having a common name or common identifying sign or symbol, Bertocchini testified that the group had "15 to 20" members who shared the common name "Misfits" and wore a patch to signify their membership in the gang. Bertocchini also testified that members of the Misfits, either separately or as a group, have engaged in a pattern of criminal gang activity. Defendant does not challenge the sufficiency of the evidence to support these elements.

With respect to whether the Misfits had as one of its primary activities the commission of one or more of the crimes enumerated in the gang statute, Lieutenant Bertocchini testified that the Misfits engaged in assault with a deadly weapon, robbery, unlawful homicide or manslaughter, the sale, possession for sale, transportation and manufacture of controlled substances, shooting at an inhabited dwelling or occupied motor vehicle, discharging a firearm from a motor vehicle, witness intimidation, grand theft of a firearm or vehicle, burglary, rape, kidnapping, mayhem, aggravated mayhem, torture, possession of a firearm capable of being concealed, criminal threats, prohibited possession of a firearm, carrying a concealed firearm, and carrying a loaded firearm as primary activities. Each of these crimes is enumerated in section 186.22, subdivision (e). Bertocchini also testified about eight specific Misfits members and their criminal

14

convictions; the prosecution admitted into evidence certified copies of these convictions. We need not chronicle each member and his corresponding criminal history. The following examples will suffice. Thomas Dudney was a member of the Misfits since the late 1970's. He was convicted of possession of a concealed firearm by a felon in 1983 and transportation of methamphetamine in 1987. Michael Kimbrell was also a member of the Misfits since the late 1970's. He was convicted of burglary in 1975, possession of a deadly weapon in 1981, and possession of a controlled substance for sale in 1988. Joe Deshetres was also a "long-time Misfit." He was convicted of possession of methamphetamine for sale in 1990 and witness intimidation in 2011. Finally, Bertocchini testified that defendant was an active member of the Misfits at the time he committed the current offenses and that these offenses were carried out with another member of the Misfits and for the benefit of the gang.

Thus, similar to *Martinez*, *supra*, 158 Cal.App.4th 1324, Lieutenant Bertocchini had an extensive background investigating outlaw motorcycle gangs. He was familiar with the Misfits based on conversations with motorcycle gang investigators, officers involved in motorcycle gang investigations, informants, and motorcycle gang members, including Manuel Charles, the longest serving Misfit and leader of the Sacramento chapter. He testified that the Misfits engage in numerous enumerated crimes as their primary activities. He testified about several predicate offenses committed by eight separate Misfits, including burglary, possession of methamphetamine for sale, and witness intimidation. Moreover, defendant's current offenses, committed with another Misfit, also provide evidence the Misfits has as one of its primary activities the commission of one or more of the crimes enumerated in the gang statute. (*Id*. at p. 1330; see also *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107-108.)

Nevertheless, defendant asserts Lieutenant Bertocchini's testimony "suffered from foundational problems." We disagree. First, while defendant points out the prosecutor showed Bertocchini the definition of criminal street gang found in section 186.22,

15

subdivision (f), and the 33 offenses enumerated in subdivision (e) of that section, he cites no authority suggesting this somehow undermines the foundation for Bertocchini's testimony. As defendant acknowledges, "Bertocchini testified that he had been investigating outlaw motorcycle gangs for about twelve or thirteen years." Second, defendant complains that "Bertocchini gave no testimony as to having conversations with [defendant], and only had spoken to Manuel Charles and apparently someone 'other than Manuel Charles.' " Defendant cites no authority suggesting a gang expert must speak with the defendant in order to provide a foundation for his testimony. While the expert in *Gardeley*, *supra*, 14 Cal.4th 605, did so, the opinion does not hold this to be a prerequisite to the admission of expert gang testimony. However, we do note Bertocchini's testimony was corroborated by defendant, who stated in his police interview that the Misfits "was a gang, and then referred to it as organized crime." In addition to watching this interview, Bertocchini "talked to the investigators [working on the case], read reports, [and] talked to other Misfit members," including the gang's longest serving member. Defendant also complains that, unlike *Gardeley*, Bertocchini did not testify to conducting "personal investigations of hundreds of crimes committed by gang members." (*Gardeley*, *supra*, 14 Cal.4th at p. 620.) But again, *Gardeley* did not hold this to be a sine qua non of expert gang testimony. Nor are we troubled by the fact Bertocchini did not provide details as to the frequency of his contact with outlaw motorcycle gang members in general, stated this contact was "probably not as much" since he became a lieutenant, could not testify about the definition used by the Department of Justice to classify criminal street gangs, and had been designated an expert in only three other cases. As mentioned, Bertocchini's experience investigating outlaw motorcycle gangs was extensive. We find there to be sufficient foundation for his expert testimony.

Finally, defendant argues: "Bertocchini appeared to rest his conclusion on the multiple convictions by named individuals, many of whom were in photos with

16

[defendant], which the prosecution painstaking[ly] proffered as predicates. However, when this evidence is scrutinized, it is insufficient in establishing beyond a reasonable doubt that the Misfits motorcycle club as a whole was dedicated to or had as one of the group's chief or principal occupations, the offenses enumerated in the statute." Defendant then painstakingly reviews each conviction and points out that many of them were committed before the individuals became members of the Misfits. This is of no consequence. Assuming, without deciding, that predicate offenses must have been committed while the individual was a member of the gang in order to be relevant to the question of whether the gang has as one of its primary activities the commission of one or more of the statutorily enumerated crimes, defendant admits "long-time Misfit" Joe Deshetres was convicted of witness intimidation in 2011. Additionally, as mentioned, Thomas Dudney was a member of the Misfits since the late 1970's and was convicted of possession of a concealed firearm by a felon in 1983 and transportation of methamphetamine in 1987. Michael Kimbrell was also a member of the Misfits since the late 1970's and was convicted of possession of a deadly weapon in 1981 and possession of a controlled substance for sale in 1988. Moreover, defendant's current offenses, carried out with another member of the Misfits for the benefit of the gang, also corroborate Bertocchini's expert testimony that the Misfits has as one of its primary activities the commission of one or more of the crimes enumerated in the gang statute.

Substantial evidence supports the jury's implied finding that the Misfits qualified as a criminal street gang within the meaning of section 186.22, subdivision (f).

## II

### *The Jury's Receipt of Inadmissible Evidence*

Defendant also claims he was deprived of his constitutional right to due process and a fair trial by the jury's exposure to certain evidence the trial court ruled was inadmissible. Specifically, as we explain in greater detail below, the jury was shown certain photographs of defendant wearing a hat that had "White Power" printed on it

17

despite the trial court's ruling no evidence would be admitted regarding the racial views of either defendant or the Misfits. The jury was also exposed to certain portions of defendant's statement to police, which the trial court also ruled were inadmissible, in which defendant stated he was on parole following serving a term in federal prison for being a felon in possession of a firearm, the Misfits were not like 99 percent of motorcycle clubs (i.e., not a "[f]amily club"), he earned his Misfits vest by "[b]eating people up," he assaulted a young man in a bar with a taser, he shot a man in the buttocks while the man was in a truck with his children, and he and other Misfits had manufactured methamphetamine in the past. The Attorney General acknowledges the jury should not have been exposed to this evidence, but argues defendant "was not prejudiced by any of this evidence based on the strength of the prosecution's case and the verdicts." We conclude the admission of this evidence did not render the trial fundamentally unfair.

## A.

### *Additional Background*

Defendant moved in limine to preclude the prosecution from presenting evidence of his prior convictions, any uncharged criminal conduct, and parole status. Defendant's criminal record includes seven felony convictions and nine violations of parole. He was convicted of involuntary manslaughter (former § 192.2, now § 192, subd. (b)) in 1970, robbery (§ 211) in 1974, possession of a firearm by a felon (former § 12021, now § 29800) in 1978, voluntary manslaughter (former § 192.1, now § 192, subd. (a)), conspiracy to commit a crime (§ 182), and possession of chemicals with intent to manufacture methamphetamine (Health & Saf. Code, former § 11383, now § 11383.5) in 1982, and possession of a firearm by a felon (18 U.S.C. § 922, subd. (g)(1)) in 1991. Defendant was on parole following serving a term in federal prison when he committed the present offenses. Defendant also moved in limine to preclude the prosecution from presenting photographs depicting "prejudicial images" to the jury.

18

During the hearing on the in limine motions, the trial court ruled defendant's state and federal convictions for possession of a firearm by a felon and his conviction for possession of chemicals with intent to manufacture methamphetamine could be used to impeach defendant should he choose to testify, but these convictions had to be sanitized. The trial court then ruled the prosecution would be allowed to use defendant's robbery conviction as a predicate gang crime, but reserved ruling on whether or not his voluntary manslaughter conviction could be so used. The trial court also ruled there would be "no reference to the Misfits limiting their membership to white males." In this regard, the prosecutor agreed to redact several photographs to cover up defendant's "white power tattoo." The trial court also tentatively ruled the jury should not receive evidence the Misfits consider themselves a "one percent" motorcycle club, "which says basically 99 percent of the people who ride bikes are law abiding, but there's a one percent who's not law abiding," but reserved final ruling on this issue.

During trial, the trial court confirmed its tentative ruling with respect to reference to the Misfits being a one percent motorcycle club. The trial court also ruled evidence of defendant's manslaughter convictions would not be admitted for any purpose because the probative value of this evidence was substantially outweighed by the danger of undue prejudice. (See Evid. Code, § 352.) The trial court confirmed its previous ruling regarding impeachment of defendant with prior convictions, but then ruled none of his prior convictions could be used as predicate gang crimes unless there was a bifurcation on that issue. This ruling was also motivated by the danger of undue prejudice. The trial court then explained, in response to a question from the prosecutor, that "any statement[s] that [defendant] makes about cooking methamphetamine back in the [1980's] in his [police interview] are not going to be allowed. . . . Anything that [defendant] says about cooking meth is so old, it's in the [1980's], and I'm assuming that that's when it is because that's when he had his conviction also. I am not going to allow it. It's more prejudicial than probative."

19

The trial court further explained that the prosecution would be required to redact defendant's police statement to exclude any reference to "white pride" or the Misfits "not allowing African Americans or women into the group." In response, the prosecutor pointed out he intended to show the jury several photographs of defendant and that in "[e]very photo of [defendant], he's wearing a hat that says 'White Power.'" The trial court responded: "Oh, geez." The prosecutor then stated that "some of these photos have already been shown to the jury, and nothing has been said." When asked whether he noticed, defense counsel responded: "To be honest, I just glanced at the photos." The trial court then covered up the offensive inscription and warned counsel: "But that doesn't mean I've caught everything, so you two need to look at it."

Defense counsel then stated: "At some point, the three of us need to go through [defendant's statement to police] and the parts that I highlighted so [the prosecutor] is clear what we're trying to get rid of, or read the pages and lines into the record." The trial court agreed the statement would need to be redacted before it could be played for the jury and admonished the prosecutor: "[A]ll I can tell you is I've made the rulings, and then I expect you to conform your evidence to the rulings that I've made. And if you have any questions as you're going through it, [']gee, I wonder what [the court] thinks about this,['] then we can get back together on that." The prosecutor asked: "And is the Court ruling that everything about [defendant's] 14 years in prison in the statement's not coming in as well? Because, again, I don't know what [defense counsel] marked." The trial court responded: "Well, I've made the ruling. If that's not admissible in your case-in-chief to prove predicate offense or to show knowledge of the gang, then you need to fashion your evidence to comply with the Court's ruling."

Later in the trial, before defendant's police statement was played, defense counsel noted for the record: "I put on top of the binder, or it should be in front of you, I went over the most recent transcript [the prosecutor] provided me of the most recent redacted version of [defendant's] statement, and I went through and gave page and line references,

20

and the reason why I thought what should be redacted should still be redacted. Let me give a copy to [the prosecutor]." The trial court responded: "All right. Thank you. And then [the prosecutor will] take a look at that, and we can talk about that further." Later, defense counsel noted for the record: "People's No. 80, the logo that's on [defendant's hat], he's informed me it's a 'White Power,' 'White Pride' type of thing. I didn't recognize it at first." The logo on the hat was "a circle with a cross on it." The trial court pointed out this exhibit "already came in" and commented: "You've got to watch for these things." Defense counsel agreed and stated that he did not know about the symbol. The trial court responded that the jury was probably also unaware of the meaning, offered to instruct them to disregard the symbol on the hat, but noted that "it almost would draw more attention to it." Defense counsel agreed not to have the jury so instructed. The parties then agreed to cover up the offensive symbol in future pictures.

Defendant's police statement was played for the jury. As mentioned, several times during the interview, defendant stated he was on parole after serving a term in federal prison for being a felon in possession of a firearm. Defendant also stated the Misfits were not like 99 percent of motorcycle clubs (i.e., not a "[f]amily club"), he earned his Misfits vest by "[b]eating people up," he assaulted a young man in a bar with a taser, he shot a man in the buttocks while the man was in a truck with his children, and he and other Misfits manufactured methamphetamine in the past.

After a portion of the statement was played, during a break in the proceedings, the trial court commented: "So you must have talked with each other about the substance, the contents of what's in the statement that's coming in." Defense counsel responded: "There was a couple of things [*sic*] that I thought I had asked to get taken out but stayed in." The prosecutor rejoined: "There was a couple of things [*sic*] he missed that I took out." Defense counsel agreed that was "probably true." The trial court then explained: "Well, you know, if there's anything that needs to be done, you let me know. I'm assuming that what I asked you and what you all said was that you had gone over this

21

transcript and that it was fine by both sides, and I don't know whether [defendant's] going to be testifying. [¶] There were certain things that I said would come in for impeachment, but then the Court's ruling on the predicates allowed the description of the firearm conviction. [¶] . . . [¶] If you're having a problem, let me know about it, and if there's something in here that shouldn't be in here, I'm trusting you to bring it up to me, and then we can talk about what to do about it."

Playback of defendant's statement continued until the evening recess. After the jury was excused, the trial court stated: "I just want to do this on the record. You know, we were off for a week, so I went back [during] the break and looked at my ruling on the predicates. My ruling on the predicates was that you'd have to bifurcate if his priors were going to be used for predicates. [¶] So you two must have talked or something because this -- that is what your recollection is, and so that if you know there's all this talk in here about him being on federal probation or parole and his firearm offense and all of that, had you all decided and shared that with each other, that that was okay[?]" Defense counsel responded: "No, not necessarily. I haven't had the chance to review it totally, and there's some things [*sic*] like we talked about earlier. There are some things that I had thought I had asked to take out, and maybe I did; maybe I didn't. I don't have any other notes with me, and then [the prosecutor] said he took out a couple of things I missed. So it's not perfect and --" The trial court interrupted: "But you're not having a problem with this coming in, about his [federal conviction]?" Defense counsel answered there was "not much" that could be done except "ask that [the prosecutor] not talk about it any further." The trial court stated: "Well, you guys need to look at this." Defense counsel responded: "I got it handed to me this morning, Judge, at 8:45." The trial court then explained: "That's my recollection of what my ruling was on the predicates, is that it needed to be bifurcated. Now, maybe it's no harm, no foul because he's testif[ying]. I don't know. But that I believe is what my ruling was, and I didn't have my notes here when I was saying that, and I had kind of an uncomfortable feeling when the [statement]

22

was coming in, but no one was objecting, so I wasn't going to say anything. And it may be not a problem at all because maybe [defendant] is testifying, but only you know that, [defense counsel], and you don't have to tell me that now." The trial court further stated: "I'm not saying that there's anything that anybody should be doing about it at this point. [¶] I would leave that up to you, [defense counsel], but you're the one -- you know more than anyone else does at this point as to whether that amounts to a hill of beans or not. So I'm just reminding everyone what the Court's ruling was, and then I'll let you two talk, but I'm correct about that on the predicates?" The prosecutor agreed he was not using any of defendant's prior convictions as predicate offenses under the gang statute and then changed the subject.

The following day, the remainder of defendant's statement to police was played for the jury. Defense counsel said nothing further with respect to the admission of the statement. Defendant did not testify.

**B.**

*Analysis*

We first note that "[t]he failure to raise a specific objection to the admission of evidence results in forfeiture of appellate review." (*People v. Nelson* (2012) 209 Cal.App.4th 698, 711; *People v. Doolin* (2009) 45 Cal.4th 390, 434.) Here, defendant did object to the admission of the challenged evidence in his motions in limine and received favorable rulings. But when the objectionable material was nevertheless admitted into evidence at trial, his trial counsel did not object. As defendant notes in his briefing on appeal, the trial court "expressed concern on numerous occasions cautioning both counsel to make sure its rulings were being complied with, to agree among themselves, to take care to properly redact the evidence, and to alert the [trial] court if there were problems." The prosecutor failed to properly redact the evidence and defense counsel failed to properly object to this failure. Had defense counsel told the trial court the objectionable portions of defendant's police statement did "amount[] to a hill of beans" and specified

23

which portions required redacting, the trial court could have ordered these specific redactions made before the remainder of the statement was played for the jury. However, we need not decide whether defense counsel's failure to object to the admission of evidence ruled inadmissible during the in limine rulings has forfeited the issue on appeal. Because defendant asserts in the alternative that his trial counsel rendered constitutionally deficient assistance by failing to prevent the jury from receiving the challenged evidence, we reach the merits regardless of whether the issue has been forfeited.[3]

With certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) One such exception is found in subdivision (b) of this section, which provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Here, evidence of defendant's prior criminal acts and parole status was not admissible to prove he possessed a criminal character and likely acted in conformity with that character in committing the drive-by shooting of Riley's house and the assault on O'Neill at the Fireside Inn. However, as mentioned, defendant was alleged to have committed these crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and was also charged with the substantive crime of gang participation (§ 186.22, subd. (a)). The fact that defendant committed prior crimes while a member of the Misfits was relevant to

---

[3]     We also note that, while defendant states in passing that "the prosecution's actions bordered on misconduct," he does not argue prosecutorial misconduct in his briefing on appeal. Nor did he object on this basis in the trial court. Accordingly, we do not address whether the prosecutor engaged in misconduct by failing to comply with the trial court's in limine rulings. In any event, even if such misconduct occurred, we would find no prejudice for the reasons stated in the remainder of this opinion.

24

prove the Misfits has as one of its primary activities the commission of one or more of the crimes enumerated in the gang statute, and therefore constituted a criminal street gang within the meaning of section 186.22, subdivision (f). So too was the evidence that the Misfits consider themselves a "one percent" motorcycle club relevant for this purpose.

Nevertheless, as the trial court acknowledged, "exposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580.) Accordingly, the trial court ruled that if the prosecution chose to use defendant's prior criminal conduct to prove the gang crime and gang enhancements, the trial would be bifurcated. This decision was within the trial court's discretion. (See, e.g., *People v. Calderon* (1994) 9 Cal.4th 69, 72 [trial court has discretion to bifurcate the determination of the truth of an alleged prior conviction from the determination of the defendant's guilt of the charged offense].) Notwithstanding this ruling, evidence of defendant's prior criminal acts and parole status made its way to the jury.

However, "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 920; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384.) Here, as we have explained, most of the challenged evidence was relevant to prove the elements of the gang crime and gang enhancements. Thus, we cannot conclude the jury must have used this evidence for the improper purpose of proving defendant's propensity to commit criminal acts. With respect to the pictures showing defendant wearing a hat with "White Power" written on it, the trial court noted that only "the T-E and the E-R" were visible. Later pictures in the series the prosecutor wanted admitted into evidence showed the offensive words "clearly," but those were the ones covered up by the trial court. One picture showed

defendant wearing a hat with "a circle with a cross on it." The jury heard no testimony regarding what this symbol meant. And defendant declined to have the jury instructed to disregard the symbol. While these pictures had no relevance whatsoever, this evidence was not of such quality as necessarily prevents a fair trial. Defendant was not deprived of his due process right to a fair trial.

Defendant disagrees, relying on *McKinney v. Rees*, *supra*, 993 F.2d 1378. Such reliance is misplaced. There, the defendant's mother was murdered while she was sleeping. Her throat was slit. Two men, the defendant and his father, were at the scene of the murder when police arrived. Neither man confessed to the crime, and neither man claimed to have seen the other commit the crime. The defendant's bloody pants were found in the den. The father was wearing a Buck knife on his belt and his bloody T-shirt was found in the bathtub. Neither the defendant nor his father had a clear motive. And while there was an abundance of knives in the house, no bloody knife was found. (*Id*. at pp. 1381, 1385.) Certain "knife evidence" was admitted. Specifically, the prosecution produced evidence that defendant possessed two "double-edge, dagger-type knives," one of which (a Gerber knife) was confiscated prior to the murder, that defendant "was proud of his 'knife collection,' that on occasion he strapped a knife to his body while wearing camouflage pants, and that he used a knife to scratch the words 'Death is His' on the door to his closet in his dormitory room." (*Id*. at pp. 1381-1382.)

The United States Court of Appeals for the Ninth Circuit held that, with the exception of the knife defendant possibly possessed at the time of the murder (a Tekna knife), there were no permissible inferences the jury could have drawn from this evidence. (*McKinney v. Rees*, *supra*, 993 F.2d at pp. 1383-1384.) Turning to whether this evidence was of such a quality as necessarily prevents a fair trial, the court explained: "The prosecution used evidence of the Gerber knife, which could not possibly have been used to commit the murder, to help paint a picture of a young man with a fascination with knives and with a commando lifestyle. . . . The jury was offered the image of a man with

26

a knife collection, who sat in his dormitory room sharpening knives, scratching morbid inscriptions on the wall, and occasionally venturing forth in camouflage with a knife strapped to his body. This evidence, as discussed above, was not relevant to the questions before the jury. It served only to prey on the emotions of the jury, to lead them to mistrust [the defendant] and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive." (*Id*. at p. 1385.) Pointing out that the case against the defendant was "solely circumstantial," the court concluded: "In this situation, [the defendant's] trial was impermissibly tainted by irrelevant evidence such that it is more than reasonably likely that the jury did not follow its instructions to weigh all the evidence carefully, but instead skipped careful analysis of the logical inferences raised by the circumstantial evidence and convicted [the defendant] on the basis of his suspicious character and previous acts, in violation of our community's standards of fair play." (*Ibid*.)

We cannot reach the same conclusion here. As we have explained, the evidence of defendant's prior criminal acts, parole status, and knowledge that the Misfits considered themselves a one percent motorcycle club was relevant to prove the Misfits qualified as a criminal street gang within the meaning of section 186.22, subdivision (f). While this evidence was arguably more prejudicial than probative, prompting the trial court to rule that a bifurcation of the trial would be required if defendant's prior criminal conduct was to be used for this purpose, the admission of this evidence in contravention of the trial court's ruling cannot be said to violate due process. (See *McKinney v. Rees*, *supra*, 993 F.2d at p. 1384 [admission of evidence that the defendant possibly possessed the Tekna knife did not violate due process because such evidence was relevant to the issue of the defendant's "identity as the murderer," even though it "may have been more prejudicial than probative and, thus, inadmissible under California evidence law"]; see also *Jammal v. Van de Kamp*, *supra*, 926 F.2d at p. 920 [admission of evidence violates due process "[o]nly if there are *no* permissible inferences the jury may draw from the evidence"].)

27

Nor is this a purely circumstantial case in which it was reasonably likely the jury convicted defendant on the basis of his prior bad acts rather than a careful review of the evidence relating to each charge. Indeed, while the jury convicted defendant of the crimes against Riley arising out of the drive-by shooting of his house (i.e., attempted premeditated murder, conspiracy to commit murder, discharge of a firearm from a motor vehicle, discharge of a firearm at an inhabited dwelling, criminal street gang activity, assault with a semi-automatic firearm, and infliction of injury on an elder adult), the jury acquitted him of the crimes against the responding officers (i.e., three counts of attempted murder and three counts of assault with a firearm on an officer). This indicates the jury carefully reviewed the evidence against defendant, concluded he was the shooter and he possessed the intent to kill Riley, but also concluded he did not intend to kill the officers. (See *People v. Lee* (2003) 31 Cal.4th 613, 623 [attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing"].) The jury must also have concluded defendant did not intend to commit a battery on the officers or that the infliction of bodily injury upon these officers — who were on the east side of the vacant lot directly to the east of Riley's house — was not a foreseeable consequence of defendant's firing multiple rounds into the north side of the house. (See *People v. Cook* (2001) 91 Cal.App.4th 910, 920 [elements of assault with a firearm include "(1) an assault, which requires the intent to commit a battery, and (2) the foreseeable consequence of which is the infliction of great bodily injury upon the subject of the assault"].) Also telling is the fact that the jury acquitted defendant of assault with a deadly weapon based on the incident at the Fireside Inn, but convicted him of the lesser-included offense of simple assault. This indicates the jury carefully considered the evidence and believed defendant's account of the incident, related to detectives during his police interview, i.e., that he punched O'Neill but did not stab him. (See *People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1312 ["that defendant was acquitted of any of the offenses suggests the lack of prejudice and the jury's clear ability

28

to consider each count on the evidence presented and nothing else"].) Thus, even if the challenged evidence was relevant only for the impermissible purpose of proving defendant's bad character, we would not find it to be reasonably likely the jury convicted defendant on the basis of his character as opposed to careful analysis of the evidence relating to each count.

Defendant also relies on a number of California cases. In *People v. Ozuna* (1963) 213 Cal.App.2d 338, the defendant was charged with the murder of his girlfriend. In the first trial, the jury could not reach a verdict. In the second trial, after evidence of the defendant's prior conviction was erroneously admitted into evidence, he was convicted of voluntary manslaughter. (*Id*. at p. 339.) The defendant did not deny fatally shooting the victim during an argument, but claimed that when he reached for the gun to scare her, it accidentally discharged. (*Id*. at p. 340.) After holding the challenged character evidence was improperly admitted, the Court of Appeal explained the error required reversal: "There can be no doubt as to the sufficiency of the evidence to justify the verdict of voluntary manslaughter, but it cannot be said the evidence of guilt was so strong as to preclude a finding of innocence. It is significant that upon the former trial there was no evidence of defendant's statement that he was an ex-convict, and the jury disagreed." (*Id*. at p. 342.) Here, the evidence against defendant was strong, at least with respect to the crimes defendant was found to have committed. That, in conjunction with the fact the jury acquitted defendant of the offenses alleged to have been committed against the sheriff's deputies, and convicted him of the lesser offense of simple assault against O'Neill, leads us to conclude defendant suffered no prejudice.

*People v. Figuieredo* (1955) 130 Cal.App.2d 498 is also distinguishable. There, Hagan was convicted of two counts of robbery. In the first of these counts, Hagan was alleged to have robbed a grocery store with another man (Figuieredo), who was tried separately. In the second, Hagan was alleged to have robbed a tire store alone. (*Id*. at p. 499.) The Court of Appeal held that two instances of prosecutorial misconduct

prevented Hagan from receiving a fair trial. The first involved bringing Figuieredo before the jury to be identified by Bonelli, an employee of the tire store, as having previously worked at that store. The second involved testimony that Hagan had previously served a prison sentence in San Quentin with Figuieredo. (*Id*. at pp. 501-502.) The court explained: "The statement of the deputy district attorney that he wanted to be sure of the identification of Figuieredo tended to create the impression that identification of Figuieredo was material for some important purpose in the trial. The identification of him was immaterial. The question by the deputy, as to whether Bonelli knew Figuieredo, came immediately after Bonelli said that Hagan asked for the little green box [containing the money]. The asking of that question at that time, the request that the bailiff bring Figuieredo in, and the bringing him in by the bailiff, when considered in connection with the evidence that Figuieredo was a former employee of the tire store and that Hagan knew him in San Quentin, tended to create inferences as follows: that Figuieredo, an ex-convict acquaintance of Hagan and former employee of the store, was connected in some way with Hagan's asking for the little green box; that Figuieredo was in custody of the sheriff upon a criminal charge that was connected in some way with Hagan; and that Hagan was an associate of Figuieredo. Also, the statement of the trial judge that Hagan and Figuieredo were being tried separately (which was made in ruling upon the request to bring Figuieredo in) tended to create an inference that Hagan and Figuieredo were jointly involved in the commission of a crime. There was no competent evidence in support of such inferences." (*Id*. at pp. 503-504.) The court further explained that, while there was eyewitness testimony identifying Hagan as having committed the robberies, there was also testimony that established an alibi for each crime. "In view of such conflict in the evidence as to the identity of the robber, the errors in creating the derogatory inferences against [Hagan] were significant." (*Id*. at p. 504.)

Here, there was also a conflict in the evidence regarding the identity of the perpetrator. As mentioned, defendant claimed Coleman committed the drive-by shooting

with Love while defendant was in San Leandro delivering Huston's sewing machine. Huston partially corroborated this alibi, testifying that defendant arrived in a truck with her sewing machine at around 12:00 p.m. and left her house in San Leandro at around 4:00 p.m. This version of events was contradicted by Coleman's testimony. It was also contradicted by testimony from Jim Cook, the cell phone expert, who testified defendant's cell phone was not used in the vicinity of San Leandro on the day of the shooting. Instead, defendant's phone was in the vicinity of Love's residence in Lathrop at around 9:15 a.m., was in the vicinity of Coleman's house at around 12:00 p.m., was in the vicinity of the crime scene at around 5:30 p.m., and was still in the vicinity of the crime scene shortly before 6:30 p.m., i.e., when the shots were fired at Riley's house. Similarly, Love's cell phone usage reveals he was in the vicinity of Coleman's house at around 12:45 p.m., was in the vicinity of the crime scene at around 5:15 p.m., was traveling eastbound on Highway 4 leaving the vicinity of the crime scene at around 6:50 p.m., was in the vicinity of defendant's residence in Manteca at around 7:05 p.m., and was in the vicinity of his residence at around 8:30 p.m. On these facts, we conclude the jury likely disbelieved defendant's version of events because it was contradicted by Cook's testimony, with which defendant expressed agreement: "Cook really knows his shit." We find no reasonable likelihood the jury disbelieved defendant because of improper inferences arising from the challenged evidence.

Moreover, in *People v. Stinson* (1963) 214 Cal.App.2d 476, *People v. Harris* (1994) 22 Cal.App.4th 1575, and *People v. Morgan* (1978) 87 Cal.App.3d 59, disapproved on another point in *People v. Kimble* (1988) 44 Cal.3d 480, 497-498, also relied upon by defendant, the reviewing courts found the erroneous admission of other acts evidence to have been harmless. So too here.

In sum, having found no constitutional violation, but agreeing with the Attorney General's concession that the challenged evidence should not have reached the jury, the standard for reversal is that articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836.

31

Under this standard, "[r]eversal is required if it is reasonably probable a result more favorable to [defendant] would have been reached without the erroneously admitted evidence." (*People v. Moten* (1991) 229 Cal.App.3d 1318, 1327.) For the reasons previously stated, we find no such probability.

## III

### *Ineffective Assistance of Counsel*

Finally, defendant asserts his trial counsel rendered constitutionally deficient assistance by failing to prevent the jury from receiving the foregoing evidence. A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid*.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; see also *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

Assuming defense counsel's failure to object to the foregoing evidence fell below an objective standard of reasonableness, for the reasons previously stated, we find no

reasonable probability of a more favorable result had the jury not been exposed to this evidence. Thus, on the facts of this case, we cannot reverse defendant's convictions on the basis of ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.


                                                                     HOCH        , J.


We concur:


      BLEASE       , Acting P. J.


      NICHOLSON   , J.